PER CURIAM.
1 tThis disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel (“ODC”) against respondent, Michael H. Bercier, an attorney licensed to practice law in Louisiana.
UNDERLYING FACTS
12-DB-075[1]

The Fontenot Matter

In March 2008, Brian Fontenot hired respondent to represent him in a *172 personal injury matter following a March 10, 2008 automobile accident. On May 27, 2008, Mr. Fontenot mailed a letter to respondent via certified mail in which he terminated respondent’s services. The next day, respondent’s wife, Monique Ber-cier, received and signed for the termination letter. Nevertheless, on June 12, 2008, respondent filed a lawsuit in the 15th Judicial District Court for the Parish of Lafayette on Mr. Fontenot’s behalf without Mr. Fontenot’s knowledge or consent.
Meanwhile, Mr. Fontenot hired new counsel to represent him. Unaware of the Lafayette Parish lawsuit, Mr. Fontenot’s new counsel filed a lawsuit on his behalf in the 32nd Judicial District Court for the Parish of Terrebonne. Once his |2new counsel found out about the Lafayette Parish lawsuit, Mr. Fontenot had to expend additional time and resources to dismiss same.
In November 2008, Mr. Fontenot filed a disciplinary complaint against respondent. In response to the complaint, respondent indicated he did not receive Mr. Fonte-not’s termination letter until June 12, .2008, after he had already filed the Lafayette Parish lawsuit on Mr. Fontenot’s behalf. In support of his contention that he did not receive Mr. Fontenot’s termination letter until after he filed the lawsuit, respondent provided the ODC with a copy of the envelope containing the letter. Handwritten on the envelope were the following notations: “5/28 1st attempt” bearing the initials “MLH” and “6/12 2nd attempt & Delivery” bearing the initials “MLH.” According to the certified mail green card return receipt, the termination letter was delivered and signed for on May 28, 2008. Therefore, contrary to respondent’s explanation, the post office could not have made a “2nd attempt and Delivery” of the termination letter on June 12, 2008. Furthermore, the ODC later learned that respondent or his office staff altered the copy of the envelope provided to the ODC by placing the false attempted delivery notations on same. Given an opportunity to further explain the situation, respondent provided additional false and misleading statements regarding his receipt of the termination letter. This time, he claimed he did not receive the termination letter until after he filed the Lafayette Parish lawsuit because his estranged wife, Monique Bercier, who had signed the date of delivery as May 28, “had many problems mishandling mail as she was angry with trying to train a new secretary.” Respondent then provided the ODC with the original envelope, which contained only the handwritten dates of “5/28” and “6/12.” When asked about the discrepancy between the original envelope and the copy provided to the ODC, respondent indicated that his secretary/office manager, Mary Hale, had written the additional notations on the copy of the envelope after asking the postmaster for an ^explanation of the dates. Respondent further claimed Ms. Hale’s notations were simply meant as a clarification of the dates to assist the ODC in its investigation and not meant to “mislead or hinder” the investigation.
The ODC alleged that respondent’s conduct violated the following provisions of the Rules of Professional Conduct: Rules 1.2(a) (scope of the representation), 1.4 (failure to communicate with 'a client), 8.4(a) (violation of the Rules of Professional Conduct), and 8.4(c) (engaging in con *173 duct involving dishonesty, fraud, deceit, or misrepresentation).

12-DB-080

The Jordan Matter

Thomas Hussman, Jr. bequeathed all of his immovable property, namely a piece of real estate located in Many, Louisiana, to respondent in his will. However, prior to his death, Mr. Hussman took out a loan from Equity Home Lenders, Inc. using the property as collateral. When Mr. Hussman died in April 2011, the Equity collateral mortgage loan remained outstanding.
On June 28, 2011, respondent wrote to Equity, advising that he was representing the interest of Mr. Hussman’s heirs. He also asked that Equity “cease any collection efforts as balance will be paid upon completion of succession.” On July 20, 2011, respondent made a $289 payment to Equity in connection with the collateral mortgage via a check from his law office bank account.
On August 8, 2011, respondent wrote to Equity’s attorney, Donald L. Wilson, advising that he was representing the interest of Mr. Hussman’s heirs and asking for a copy of Mr. Hussman’s title for the property. That same day, Mr. Wilson forwarded respondent a copy of the deed and a copy of the collateral mortgage on the property.
| Respondent subsequently hired attorney Maurice Tynes to handle Mr. Huss-man’s succession. The succession documents were filed on October 13, 2011, with the detailed descriptive list stating the value of the property as $75,000: The next day, the judge signed the judgment of possession.
Meanwhile, respondent listed the property for sale through real estate agent Anne Trahan. On October 8, 2011, John and Nancy Jordan submitted an offer to purchase the property for $55,000, and respondent accepted this offer on October 13, 2011. The purchase agreement signed by both respondent and the Jordans clearly stated that
SELLER shall deliver to BUYER a merchantable title at SELLER’S costs... SELLER’S title shall be merchantable and free of all liens and encumbrances except those that can be satisfied at Act of Sale. All cost and fees required to make title merchantable shall be paid by SELLER ...
The Jordans asked Ms. Trahan if respondent had clear title to the property. When Ms. Trahan questioned respondent, he informed her of the succession proceedings but not of the collateral mortgage. Neither Ms. Trahan nor the Jordans were informed of the collateral mortgage prior to the closing. The Jordans knew respondent was an attorney, so they opted not to request a title examination of the property based on the information he had provided.
Attorney Ken Simmons handled the closing, and no one advised him of the collateral mortgage prior to the closing. Mr. Simmons prepared the “Cash Sale Deed, As Is Without Warranty” and the HUD-1 settlement statement for the closing. Neither the cash sale deed nor the HUD-1 settlement statement listed the collateral mortgage in favor of Equity. On October 27, 2011, respondent sold the property to the Jordans for .$55,000 with the cash sale deed stating the property was transferred “without any warranty or guarantee to the title or chain of title, or to the fitness of the buildings...” It further stated that “[t]he parties herein further declare |sthat neither the undersigned authority of this instrument, nor the preparer of this instrument, nor any other person has performed a title examination of this property, and they acknowledge that the *174 said persons have acted only in the capacity as set forth in this instrument, relying on, and using, information furnished by the parties herein...”
At some point, Equity’s manager, Kim Burchell, contacted respondent for an update and was informed the property had been sold “as is.” Respondent also informed Ms. Burchell to contact the buyers for payment. On March 23, 2012, Mr. Wilson, Equity’s attorney, wrote to respondent reiterating their understanding that the collateral mortgage was to be paid off once the succession was complete. .Mr. Wilson stated, “[f]rom a review of this transaction, the buyers where [sic] either uninformed or it was not disclosed to them the fact that this property was encumbered by a validly contracted mortgage ...” On March 27, 2012, Mr. Tynes, acting as respondent’s attorney, wrote to Mr. Wilson regarding Mr. Hussman’s succession, stating that respondent
“... sold the property, without warranty of title, which was in effect a quit claim deed. No title exam or opinion was given to the buyer, which may have shown a mortgage in favor of Mr. Wilson’s client with a payoff of $28,250... When the current owner is faced with foreclosure... perhaps he will be motivated to create a solution to satisfy everyone ... Mr. Bercier will not take part in any settlement discussions, but if $2,500 from him, without any liability to anyone, and not considering this as any acknowledgement of any kind as to any liability, would get all of this resolved, I would recommend he pay it.”
On April 5, 2012, Mr. Wilson wrote to the Jordans in “an attempt to collect a debt” and advised them of the collateral mortgage on the property they purchased from respondent. Mr. Wilson stated that “Mr. Bercier was well aware of this debt at the time that he sold this property to you. by correspondence which I have in my file.” Mr. Wilson further stated, “[s]ince by the terms of your deed you 1 ^evidentially [sic] may have been unaware of this debt,” he would give them an opportunity to satisfy the debt before proceeding with foreclosure.
On April 12, 2012, Mr. Wilson wrote to the Jordans again in “an attempt to collect a debt.” He advised them that the payoff amount of $23,250 was good through April 27, 2012. He also warned them that should the matter not be liquidated within fifteen days, Equity would proceed legally against the property. The Jordans subsequently paid off the outstanding collateral mortgage.
The ODC alleged that respondent’s conduct violated the following provisions of the Rules of Professional Conduct: Rules 8.4(a) and 8.4(c).
DISCIPLINARY PROCEEDINGS
In November 2012, the ODC filed formal charges against respondent in 12-DB-075. In December 2012, the ODC filed formal charges against respondent in 12-DB-080. Soon thereafter, the two sets of formal charges were consolidated by order of the hearing committee chair. Respondent, through counsel, answered the consolidated charges, essentially denying any misconduct.. The consolidated matter then proceeded to a formal hearing on the merits.

Hearing Committee Report

After considering the evidence and testimony presented at the hearing, the hearing committee made the following factual findings:
The Fontenot Matter — Tammy Peshoff, the postmaster in Cameron, testified about the termination letter Mr. Fontenot sent respondent via certified mail. She recognized the date notations as her handwrit *175 ing and explained May 28 was the date the post office received the letter in Cameron and June 12 is the standard fifteen days later they would actually return the letter if unclaimed. She also testified that the “first attempt” notation with someone’s initials and “second |7attempt and Delivery” notation with someone’s initials were not in her handwriting. She further explained that the exact delivery date is determined from the green return receipt card that goes with the letter, and that the actual delivery date was May 28. Respondent’s counsel stipulated to the May 28 date of receipt. Ms. Peshoff spoke with respondent about the receipt date and explained to him that the delivery date was May 28. and not June 12. She did not recall speaking to Mary Hale, respondent’s secretary, about the envelope and did not know who Ms. Hale was. The committee found Ms. Peshoff s testimony to be credible.
Respondent admitted to filing a lawsuit for Mr. Fontenot,-even though Mr. Fonte-not had terminated his services fifteen days earlier, because respondent had not seen the termination letter. Respondent also admitted that it was his own fault and negligence that caused him to not see the termination letter until sometime after he filed Mr. Fontenot’s lawsuit. However, he further testified that Mr. Fontenot and his wife went over the lawsuit with him on May 27 and that Mr. Fontenot had implicitly authorized him to file the lawsuit when he was hired. He indicated that he had no notice whatsoever that Mr. Fontenot had another attorney, who had filed a lawsuit on Mr. Fontenot’s behalf, until he received a fax on October 30, 2008. At that point, he withdrew as Mr. Fontenot’s counsel. Regarding the termination letter envelope, respondent indicated his secretary, Mary Hale, handwrote the notations on the envelope bearing the initials MLH. He had instructed Ms. Hale to go to the post office for an explanation of the dates on the envelope in an effort to cooperate with the ODC, and she placed the notations on the envelope when she returned to the office. He indicated he did not inform the ODC that the envelope had been altered and contained handwritten notations by himself or his staff because he thought the ODC would be able to tell it had been altered since the handwriting and the ink colors were different.
| «Roger Miller, who was friends with Mr.' Fontenot and had previously been represented by respondent, testified that he referred Mr. Fontenot to respondent. He also testified that he was present during respondent and Mr. Fontenot’s first meeting, during which respondent informed Mr. Fontenot that if he was hired he would file a lawsuit.
Attorney Grady Abraham, who represented' Mr. Fontenot after Mr. Fontenot terminated respondent’s representation, testified that he advised respondent of his representation via a letter dated October 30, 2008. Mr. Abraham’s file contained a telephone message dated October 29, 2008, which indicated respondent called several times requesting that Mr. Abraham sign some papers, possibly promissory notes, for advances respondent made on Mr. Fontenot’s case.
Monique Bercier Hulin, who was previously married to respondent during the relevant times herein, reviewed and verified her signature on the green return receipt card and the date of receipt of May 28, 2008 written thereon. She testified that she was not aware of any problems she had mishandling mail during this time. She also denied being angry that she had to train a new secretary in May 2008 and had no reason to withhold mail from respondent, which was contrary to respondent’s representations.
*176 Mr. Fontenot testified that he was not getting the proper care from respondent and was struggling with bills and receiving no benefits so he terminated respondent’s services. He wanted an attorney “who could give me worker’s compensation or some kind of benefits.” He indicated that he sent the termination letter dated May 27, 2008 via certified mail and received the green return receipt card indicating Monique Bercier had signed for the letter. He further testified that he had no knowledge that respondent was going to or had filed a lawsuit on his behalf on June 12, 2008. He received no notice whatsoever, and it was never explained to him that the lawsuit would be filed.
|flMary Hale, respondent’s secretary at the relevant times herein, testified that the notations on the termination letter envelope, other than the two dates, were in her handwriting. She denied ever going to the post office or speaking with anyone-from the post office by telephone to inquire about the May 28 and June 12 dates written on the envelope. She testified that the notations she .made on the envelope were what respondent told her to writé. She also denied making the notations in order to clarify the two dates in an effort to cooperate with the ODC’s investigation.
Based on the above testimony and other evidence presented at the hearing, the hearing committee determined that respondent did not violate Rules 1.2(a) and 1.4 of the Rules of Professional Conduct in this matter. Specifically, the committee found that, while respondent was sloppy in his office practice and in his communication with Mr. Fontenot, the evidence and testimony does not prove by clear and convincing evidence that respondent failed to communicate with his client or failed to allow him to participate in decisions concerning his representation. According to the committee, respondent told Mr. Fonte-not from the start that a lawsuit would be filed, which conversation was witnessed by Mr. Miller. Respondent testified he met with Mr. Fontenot and his wife on the eve before filing suit to go over everything with him, and Mr. Fontenot was aware he was going to file the lawsuit. On the other hand, Mr. Fontenot denied that such a meeting took place. As such, the testimony on this issue was conflicting. Furthermore, the evidence and testimony presented did not convince the committee that respondent read the termination letter or that he was otherwise informed he was terminated prior to receiving the written correspondence provided by Mr. Fonte-not’s new counsel in October 2008. After that time, respondent took no further action to represent Mr. Fontenot. As such, the evidence and testimony did | innot convince the committee that respondent intentionally continued to represent Mr. Fonte-not.
Regarding respondent’s communications with the ODC, the committee found that respondent instructed Ms. Hale to add the notations to the subject envelope in an effort to mislead the ODC. The committee found Ms. Hale’s testimony to be credible and directly contradicted respondent’s testimony on several key issues. Specifically, Ms. Hale denied ever going to the post office to obtain an explanation of the dates in question. She also testified that respondent told her the language to write on the envelope. Respondent’s attempts to deceive the ODC are clear from his responses to Mr. Fontenot’s disciplinary complaint. The committee also noted that Ms. Peshoff testified that she spoke to respondent about the date the termination letter was delivered but did not recall speaking to Ms. Hale. Respondent’s ex-wife also testified that she and respondent were married and living together at the relevant times herein, and she denied having any trouble handling the mail during *177 that time. Based on these findings, the committee determined that respondent violated Rules 8.4(a) and 8.4(c) in this matter.
The Jordan Matter — The committee found that, beginning in June 2011 and continuing through August 2011, respondent held himself out several times as an attorney representing Mr. Hussman’s. heirs. He initially did so in a letter (on his attorney letterhead) dated June 28, 2011 to Equity. He acknowledged the collateral mortgage Equity held against Mr. Huss-man’s property and requested that Equity cease collection efforts “as the balance will be paid upon completion of the succession.” On August 8, 2011, respondent advised Mr. Wilson,-Equity’s attorney, that his office (Michael Bercier, Attorney At Law) will be representing Mr. Hussman’s heirs. From his law firm checking account, respondent also made a $289 loan payment to Equity on July 20, 2011. Equity relied on these ^representations and delayed foreclosure proceedings. Respondent never informed Equity that he was the sole legatee of Mr. Hussman’s estate.
As part of Mr. Hussman’s succession, respondent (now as the sole legatee) signed the detailed descriptive list listing the assets and debts of the estate, including a $16,000 debt to Equity. However, the detailed descriptive list did not indicate whether a mortgage existed on Mr. Huss-man’s property. Although signed and notarized on September 1, 2011, the detailed descriptive list was not filed until October 13, 2011, which was the same day respondent (as the seller) executed a “Residential Agreement to Buy or Sell” with the Jor-dans (as the buyers). In this purchase agreement, both the buyer and the seller acknowledged that the sale would be “AS IS, WHERE IS, WITHOUT WARRANTIES.” Additionally, both the buyer and the seller acknowledged that the sale would be “free of all liens and encumbrances...” It further stated that “All costs and fees required to make title merchantable shall be paid by Seller, Seller shall make good faith efforts to deliver merchantable title.” Despite these requirements in the purchase agreement, the final deed executed by both parties and recorded on November 14, 2011 was not “free of all liens” ¿s required. Despite knowing a mortgage existed on the property, respondent never informed the Jordans or Ms. Trahan, the real estate agent who represented both parties, of its existence either in his capacity as the attorney for Mr. Hussman’s heirs or as the sole legatee. There is no question he had such knowledge.
Furthermore, after representing to third parties that he was the attorney representing Mr. Hussman’s heirs, respondent never advised them he was the sole legatee. He also never advised them that he withdrew as counsel for the heirs. As far as they knew, he was still acting in his capacity as attorney for the heirs.
Respondent executed a reduction in the sale price of the property on October 7, 2011. He testified that he reduced the price because the buyer would have to lipbuy the property subject to the existing mortgage, contrary to the “free of lien” language in the purchase agreement he executed on October 13, 2011. However, he never disclosed to the buyer or the real estate agent that (1) a mortgage existed on the property and (2) the reduction in the sale price was due to the mortgage. The committee determined this testimony was self-serving and not credible.
According to the committee, the issue is whether respondent was acting in his capacity as an attorney between August 8, 2011 and October 13, 2011 when he signed the purchase agreement. It is undisputed that he made representations to third parties that he was the attorney for Mr. Huss- *178 man’s heirs and never advised them otherwise. The committee further determined that respondent did not act in good faith with respect to the Jordans. He engaged in dishonest behavior when he knowingly-deceived the Jordans by failing to disclose the- collateral mortgage on the property despite having full knowledge of same. Furthermore, since there is no evidence that respondent ever advised any third parties that he was no longer acting in his capacity as the attorney for Mr. Huss-man’s heirs, the committee determined that he was still doing so at the pertinent times herein. His intentional actions directly resulted in the Jordans having to pay in excess of $23,250 to satisfy the collateral mortgage he knew existed but failed to disclose and agreed to pay out of Mr. Hussman’s succession as its attorney.
While the Jordans did have the opportunity to examine the title, which opportunity they waived, they testified that they were informed and believed that respondent was a licensed real estate attorney, so they believed they could trust him. Moreover, respondent agreed in the purchase agreement that the property would be sold, free of all liens, which he knew would not be so.
Respondent also deceived Equity in his capacity as an attorney for his own personal benefit. Although the mortgage was ultimately paid off by the Jordans, it was not paid as respondent presented it would be (upon completion of the | ^succession) in his capacity as an attorney. To the contrary, Equity was forced to take action by pursuing the Jordans in order to collect a debt. Equity relied on respondent’s representations as an attorney and delayed the pending foreclosure. Had Equity known respondent was the sole legatee, it could have executed on the property. Although respondent, as the sole heir, received the proceeds of the sale of the property, which was the only asset listed in the estate, the mortgage was not paid. Rather than paying the mortgage from the net proceeds of the sale as he agreed to do, he put the money in his pocket.
Based on these findings, the committee determined that respondent knowingly and intentionally engaged in deceitful and dishonest conduct in his capacity as an attorney as it relates to Equity and the Jor-dans. Accordingly, the committee determined respondent violated Rules 8.4(a) and 8.4(c) of the Rules of Professional Conduct in this matter.
The committee further determined that respondent knowingly and intentionally violated duties owed to the public and the legal profession. His conduct caused actual injury to the Jordans. After considering the ABA’s Standards for Imposing Lawyer Sanctions, the committee determined that the baseline sanction is disbarment.
In aggravation, the committee found a dishonest or selfish motive, refusal to acknowledge the wrongful nature of the conduct, and substantial experience in the practice of law (admitted 1981). In mitigation, the committee found the absence of a prior disciplinary record and the fact that some of respondent’s conduct may be construed as not being conducted in his capacity as an attorney.
In light of respondent’s lack of a prior disciplinary record and case law addressing similar misconduct, the committee recommended respondent be suspended from the practice of law for three years, with two years deferred, subject to two years of supervised probation and restitution to the Jordans in the amount of | u$23,250. The committee further recommended that respondent be assessed with only the costs associated with the Fontenot and Jordan matters.
*179 Both respondent and the ODC objected to the committee’s report and recommendation. Respondent objected to the committee’s findings that he violated any of the Rules of Professional Conduct as alleged and argued that the recommended sanction was too harsh, even if he were found to have violated the alleged rules. The ODC objected to the committee’s failure to find a violation of Rules 1.2(a) and 1.4 of the Rules of Professional Conduct in the Fontenot matter and argued that the recommended sanction was too lenient.

Disciplinary Board Recommendation

After review, the disciplinary board determined that the hearing committee’s findings were not manifestly erroneous and were supported by the record. Accordingly, the board adopted the committee’s factual findings and legal conclusions.
The board then determined that respondent knowingly and intentionally violated duties owed to the public and the legal profession, which caused actual harm to the Jordans. Like the committee, the board determined that the baseline sanction is disbarment.
The board found the following aggravating factors present: a dishonest or selfish motive, a pattern of misconduct, multiple offenses, submission of false evidence, false statements, or other deceptive practices during the disciplinary process, refusal to acknowledge the wrongful nature of the conduct, and substantial experience in the practice of law. In mitigation, the board found the absence of a prior disciplinary record and personal or emotional problems (respondent’s father passed away in June 2012, and respondent separated from his wife in September 2012).
[ 1SAfter a review of case law addressing similar misconduct, the board determined that, while the committee’s recommended sanction was too lenient, the baseline sanction of disbarment was too harsh. Accordingly, the board recommended that respondent be suspended from the practice of law for one year and one day and be required to make restitution to the Jor-dans in the amount of $23,250. Like the committee, the board also recommended that respondent be assessed only with the costs and expenses related to the Fontenot and Jordan matters.
Although neither respondent nor the ODC filed an objection to the board’s report and recommendation, on our own motion, we ordered the parties to submit written briefs addressing whether the sanction recommended by the board was appropriate. Both respondent and the ODC submitted a brief in response to our order.
DISCUSSION
Bar disciplinary matters fall within the original jurisdiction of this court. La. Const, art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. In re: Banks, 09-1212 (La.10/2/09), 18 So.3d 57. While we are not bound in any way by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard is applicable to the committee’s factual findings. See In re: Caulfield, 96-1401 (La.l1/25/96), 683 So.2d 714; In re: Pardue, 93-2865 (La.3/11/94), 633 So.2d 150.
In this matter, the record supports a finding that respondent provided false evidence and false statements to the ODC during its investigation of the Fontenot matter and engaged in dishonest conduct with respect to the Jordans and Equity. JigAs such, respondent has violated the *180 Rules of Professional Conduct as found by the hearing committee and adopted by the disciplinary board.
Having found evidence of professional misconduct, we now turn to a determination of the appropriate sanction for respondent’s actions. In determining a sanction, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct. Louisiana State Bar Ass’n v. Reis, 513 So.2d 1173 (La.1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved considered in light of any aggravating and mitigating circumstances. Louisiana State Bar Ass’n v. Whittington, 459 So.2d 520 (La.1984).
Respondent knowingly and intentionally violated duties, owed to the public and the legal profession, causing actual harm to the Jordans. The record supports the aggravating and mitigating factors found by the board. Additionally, the mitigating factor of respondent’s physical disability is present.
Turning to the issue of an appropriate sanction, we find guidance from the case of In re: Jones, 12-1700 (La.1/25/13), 106 So.3d 1019. In Jones, an attorney engaged in dishonest conduct by notarizing legal documents outside the presence of the signatories and causing those documents to be filed in conveyance records, closing a real estate transaction that he knew or should have known was part of an illegal “house flipping” scheme, and signing succession pleadings that omitted two of seven heirs and then failing to take any remedial action after learning of the error. For this knowing and intentional misconduct, which caused actual harm to the attorney’s clients and to the legal profession, we imposed a two-year suspension from the practice of law.
In light of this case law and the numerous aggravating factors present, we will reject the board’s recommended sanction and instead suspend respondent from |17the practice of law for two years. We will also order respondent to make restitution to the Jordans in the amount of $23,250 plus legal interest. Finally, we will assess respondent only with the costs and expenses related to the Fontenot and Jordan matters.
DECREE
Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record and the briefs filed by the parties, it is ordered that Michael H. Bercier, Louisiana Bar Roll number 3009, be and he hereby is suspended from the practice of law for two years. It is further ordered that respondent shall make restitution to John and Nancy Jordan in the amount of $23,250, together with legal interest from the date of misappropriation until paid. The costs and expenses related to the Fon-tenot and Jordan matters are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court’s judgment until paid.

. 12-DB-075 originally consisted of two counts of alleged misconduct. After considering the evidence and testimony presented at the formal hearing, the hearing committee determined there was insufficient evidence to prove respondent violated the Rules of. Profes *172 sional Conduct as alleged in the first count of the formal charges. In its pre-argument brief to the disciplinary board, the ODC indicated it did not object to the committee's findings or conclusions regarding the first count, essentially resulting in the dismissal of the count. Accordingly, we will not address the first count of alleged misconduct originally set forth in 12-DB-075.